UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

GERALD COFFIN and DAWN WHITBECK *on behalf of themselves and all others similarly situated*,

Plaintiffs,

v.

UNISON AGREEMENT CORP., UNISON INVESTMENT MANAGEMENT, LLC, and ODIN NEW HORIZON REAL ESTATE FUND, LP,

Defendants.

No. 1:26-cv-01587-TAM

**FIRST AMENDED COMPLAINT**

## INTRODUCTION

1. For many Americans, their home is their financial anchor. A person's home is often the product of years of savings, a source of security and stability when times get tough, and the primary legacy they will leave to their children. For that reason, New York law creates strong protections for homeowners in the field of mortgage lending. These include disclosure rules to ensure homeowners understand the cost of credit, caps on interest rates to prevent lenders from charging usurious returns, substantive limitations on the highest cost home loan products, and licensing requirements to ensure that home loans are being made lawfully by legitimate companies. These safeguards are crucial for homeowners.

2. But Unison sidesteps these safeguards, issuing illegal mortgage loans masquerading as "option" contracts. Unison's complex "HomeOwner Agreement" poses greater risks than more traditional mortgages, but purports to be exempt from laws regulating mortgage lenders. Unison calls its product an "option" to purchase an interest in homeowners' homes, but

it is not a true option. Instead, it is an advance of funds to be repaid at a later date, with substantial interest, secured by a home. In other words, it is a residential mortgage loan.

3. Unison attempts to hide this reality through a combination of complex accounting and deceptive marketing. This includes illusory payments, opaque fees, convoluted terms, and claims meant to reassure homeowners that they are "partners" with Unison, won't take on any debt, and won't have to pay any interest. The reality is anything but. Unison isn't a partner with homeowners—as its own contract admits in fine print. Instead, it locks them into contracts under which they must pay Unison far more money than they received up front—and, in some cases, forces them to sell their homes to do so.

4. Plaintiffs are two victims of Unison's illegal scheme.

5. Gerald Coffin is a retired firefighter who lives in Brooklyn. Several years ago, Mr. Coffin was navigating how to live on diminished income. In 2021, he saw one of Unison's television ads and contacted Unison about getting a loan. After he signed nearly 100 pages of complex contracts, Unison paid out a lump sum of $167,490.45. What Mr. Coffin did not understand when he signed the agreement was that he would be forced to repay Unison far more money than he received at an interest rate far higher than the legal limit. In 2025, Mr. Coffin paid Unison $412,387 to exit his agreement. That is a simple interest rate of around 40.81% and an Annual Percentage Rate of 28.6%, far above what New York law permits and far greater than any traditional mortgage-secured loan.

6. Dawn Whitbeck is a retired United States Postal Service worker who lives in West Babylon, New York. Several years ago, Ms. Whitbeck was looking for a means to pay down some credit card debt and fund a kitchen renovation when Unison called with an offer: it could provide her cash up front, with no interest, in exchange for an "option" on her home. In

fact, what Unison provided Ms. Whitbeck is a loan. After she signed over 100 pages of opaque contract documents, including a mortgage giving Unison the power to foreclose on her home, Unison paid out a lump sum of $43,960.50. Today, Unison asserts that Ms. Whitbeck owes between $147,633 and $213,778. That is equivalent to an annual simple interest rate of 26.04% to 43.67%, or an annualized percentage rate ranging from 15.50% to 21.40%.

7. Plaintiffs bring this suit to protect themselves and other New York homeowners from Unison's unlawful conduct. Plaintiffs seek declaratory and injunctive relief, restitution, damages, and other appropriate remedies to halt Defendants' unlawful conduct, remedy the usurious and unfair interest demanded at payoff, and restore to homeowners the protections guaranteed by New York law.

**PARTIES**

8. Plaintiff Gerald Coffin is a citizen of the State of New York.

9. Plaintiff Dawn Whitbeck is a citizen of the State of New York.

10. Defendant Unison Agreement Corporation (UAC), is a Delaware corporation with a principal place of business at 650 California St., Fl. 1800, San Francisco, CA 94108 and with its principal office location at 4 Embarcadero Center, Ste. 710, San Francisco, CA 94111.

11. Defendant Unison Investment Management, LLC (UIM), is a Delaware corporation and SEC-registered investment advisor with a principal place of business at 4 Embarcadero Center, Suite 710, San Francisco, CA 94111. UIM also does business as Odin Investment Management.

12. Defendant Odin New Horizon Real Estate Fund LP ("Odin Fund") is a Delaware limited partnership with its principal place of business at 4 Embarcadero Center, Suite 710, San Francisco, California 94111.

13. Defendants use the same offices and employees, including offices located at 4 Embarcadero Center, Ste. 710, San Francisco, CA 94111.

14. Defendants are joined, by agreement, in a joint venture or common enterprise.

15. Because of their agreement and cooperation in the wrongful acts set forth herein, Defendants are also co-conspirators and responsible for the acts of one another.

16. Defendants are referred to collectively as "Unison" in this complaint.

## JURISDICTION AND VENUE

17. This Court has jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1332(a).

18. There is complete diversity of citizenship between the parties.

19. The amount in controversy exceeds $75,000. Mr. Coffin seeks to recover more than $75,000 of the over $400,000 he paid to Unison under its HomeOwner Agreement. Ms. Whitbeck seeks relief from a future payment obligation that exceeds $75,000.

20. Venue is proper in this District under 28 U.S.C. § 1391, as the acts, omissions, or transactions that give rise to this action occurred, in substantial part, in this District. Specifically, Plaintiffs' homes, which serve or served as the collateral for Unison's illegal loans, are located in this District and Plaintiffs were in this District when they signed Unison's form agreements.

## SUMMARY OF FACTUAL ALLEGATIONS

21. New York law has long protected against predatory lending practices and misleading marketing—especially in mortgage lending, where people's homes are on the line.

22. Unison claims that it is exempt from these laws. That's because, according to Unison, its product is not a loan at all but an "option." But behind Unison's complex math and confusing terminology, its product is a mortgage loan. Unison gives a homeowner a sum of

money up front, in exchange for a large payment at the time of a triggering event, secured by a mortgage on the home.

23. Unison portrays this payment obligation as the exercise of an "option" where Unison purportedly pays the homeowner a second sum of money for 70% of the value of his home. That supposed second payment is simply an offset from the profits Unison takes from the sale of a home—it is never actually deposited into a homeowner's account and it is money the homeowner would have received from the sale of his home absent any contracts with Unison. This second "payment" is therefore illusory and Unison's "option" is simply the mechanism by which the company receives its future payment.

24. Unison's HomeOwner Agreements also closely resemble reverse mortgages, a specific form of residential mortgage loan that is especially risky for homeowners.

25. With reverse mortgages, the lender gives the homeowner an advance payment and receives security in the form of a mortgage on his home. In exchange, when certain future triggering conditions are met—such as sale of the home, death, or moving out—the homeowner must pay the lender, often through balloon payments that can vary with the value of the home. When insufficiently regulated, the complex mechanisms of these products often dramatically obscure how much the homeowner will have to pay, and they have been financially ruinous for too many elderly homeowners.

26. To guard against these dangers, New York dictates that reverse mortgage lenders must make certain required disclosures, receive certification that the borrower has consulted with an attorney or certified housing counselor, and, in some cases, cannot receive more than 20% of the appreciation in the homeowner's equity. NY Real Prop L § 280(2)(e), (g), § 280-a(2)(d).

27. Unison's mortgage loans operate like reverse mortgages—except that they are costlier and do not comply with consumer protections. Unison gives homeowners an advance in exchange for a mortgage on the property to secure the loan. Then, when certain future triggering conditions are met—such as sale of the home, death, or moving out—the homeowner must pay Unison a balloon payment that varies with the value of the home.

28. Unison recoups effective rates of interest that are illegal under New York law. And Unison fails to comply with other laws and regulations designed to protect homeowners.

29. The consequences of these evasions are disastrous for homeowners, as this case illustrates.

30. In 2021, Unison made an advance payment of $167,490 (this is the net amount paid to Mr. Coffin after Unison offset $10,135.55 in closing costs and fees from its $177,625 "Initial Payment").

31. Forty-three months later, Mr. Coffin had to pay Unison $412,387 to exit his HomeOwner Agreement.

32. That results in a simple interest rate of approximately 40.81% and a 28.6% APR.

33. In Ms. Whitbeck's case, Unison provided an advance of $43,960.50, after deducting $6,039.50 in various transaction and recording fees.

34. Today, if Ms. Whitbeck wants to remove the lien on her home, she will be required to pay Unison between $147,633 and $213,778, plus thousands more in closing costs and fees. That is equivalent to a simple annual interest rate between 26.04% and 43.67%, and a 15.5% and 21.4% APR.

35. Ms. Whitbeck cannot afford to repay those amounts to Unison.

36. These effective simple interest rates are far higher than traditional home lending products, and far higher than New York law allows.

### A. Unison's lopsided contract is structured to ensure that it will receive a large future payment at the homeowner's expense.

37. Stripped of complex accounting, lengthy contracts, and opaque terminology, Unison's product is a loan. Unison provides homeowners an advance in exchange for a large payment in the future, secured by a mortgage on the home.

38. This advance, called an "Initial Payment,"[1] is a small percentage of the "Original Agreed Value" of the home (in Mr. Coffin's case, 17.9% and in Ms. Whitbeck's case, 11.5%).

39. In exchange for this advance, in 30 years or less, a homeowner is required to pay Unison a large sum of money based on the value of their home. In Mr. Coffin's case, this sum amounted to 70% of the appreciation in his home equity above the "Original Agreed Value." For Ms. Whitbeck, it was 45.98% of that value.

40. Unison also records a mortgage on the home, which secures all the homeowner's payment obligations under its contracts—on pain of foreclosure.

41. Unison's contracts set forth "Exercise Events" that trigger the end of the contract and payment: the "Expiration Date"; the sale of the property; the owner's death; or the owner's default.

42. All of Unison's "Exercise Events" require a homeowner to pay Unison—either directly or out of the proceeds of the sale. If a homeowner cannot afford to pay Unison directly, Unison will force the sale of the home to obtain its payment.

43. The other possible outcomes of the contract similarly require payment.

---

[1] At various times, Unison has also referred to this as an "Investment Payment."

44. For instance, if a homeowner wants to exit their agreement with Unison before the occurrence of an "Exercise Event," in what Unison deems a "Special Termination," they must pay Unison *the greater* of: the Unison Initial Payment plus additional fees; or (b) the amount Unison would receive if they sold their home.

45. The homeowner's payment to Unison in the event of a sale or other "Exercise Event" will be calculated as follows: Unison takes its "Investor Percentage" of the present value of the home and then subtracts a purported second payment. This second amount is called the "Balance Payment."[2] Together with the "Initial Payment," this constitutes the amount Unison purports to be paying the homeowner.

46. That is misleading, however, because Unison will never pay the homeowner the "Balance Payment." At the time of the sale, Unison offsets the Balance Payment against its claimed right to 70% of the value of the home.

47. The result of this illusory second payment and complex math is that, in 30 years or less, the homeowner (or their estate) will be forced to pay Unison far more than they received—and far more than the law allows.

48. In its marketing materials to borrowers, and in the courtroom, Unison insists that it might never be repaid. But, Unison has structured its agreement to practically eliminate that possibility and guarantee sizeable returns.

49. This lopsidedness begins before a homeowner even enters an agreement with Unison.

[2] At various times, Unison has also referred to this as the "Unison Purchase Price Balance."

50. Unison uses a "very sophisticated data infrastructure and pricing structure" to target specific regions, areas, neighborhoods, and even specific houses to ensure that it picks homes that will rise significantly in value, maximizing its return. *Podcast Transcription Session No. 103—Thomas Sponholtz & Jim Riccitelli*, Lend Academy (hereinafter "Unison Podcast") (2017), https://perma.cc/5RZ4-TP2K. The company touts that: "We have a 10-year forecast on every house in America." *Unison Podcast*.

51. Unison further secures its returns when it makes its loan offer to homeowners.

52. The starting point for that offer is the home's appraised value. On information and belief, Unison uses appraisal vendors who minimize this value to lower its payment to homeowners and increase its returns under the Agreement.

53. Next, Unison overtly deflates that appraised value by applying a downward "risk adjustment" to arrive at the "Original Agreed Value." Unison calculates the amounts that it owes to the HomeOwner—the "Initial Payment" and "Balance Payment"—as a share of this deflated figure. It calculates its own interest, in contrast, as a share of the market value of the home when the Exercise Event occurs.[3] Accordingly, when it later calculates its percentage share of the increased value of the home, Unison's share is more profitable.

54. This "risk adjustment," which reduces the homeowner's advance without diminishing Unison's interest, also operates as a hidden loan fee.

55. Second, Unison makes the homeowner bear all closing costs for the loan. This includes several thousand dollars in fees owed directly to Unison for a "transaction fee" and an "appraisal fee." More goes to fees for the title, recording fees, and mortgage tax. *Id.*

---

[3] Unison will only calculate its interest as a share of the Original Agreed Value if that value exceeds the appraised value or effective sales price.

56. Unison advances the money for these fees by reducing its "Initial Payment" in the total amount of the fees and taxes.

57. Once a homeowner has accepted Unison's lopsided offer terms and signed its HomeOwner Agreement, Unison further protects its right to repayment at every turn.

58. In several scenarios, Unison is expressly guaranteed repayment of its advance (plus fees) at a minimum.

59. If a homeowner sells their home during the first three years of the contract, they will have to pay Unison what amounts to a pre-payment penalty, requiring payment of *the greater* of: (a) his initial advance (plus fees); or (b) the amount Unison would receive if they sold their home.

60. Unison is also expressly guaranteed repayment if a homeowner uses the "Special Termination" mechanism to get out from under this onerous contract without leaving their home.

61. If a homeowner defaults on any of their obligations under Unison's contracts, the company can foreclose and force the sale of the home and is expressly guaranteed repayment of its advance at a minimum. Unison can also make advances that accrue fees and interest at a usurious rate or seek additional liquidated damages.

62. Even outside of the scenarios where Unison is expressly guaranteed repayment, there are several features of Unison's product that ensure it will receive such a payment in practice.

63. To ensure that nothing will decrease the value of the home or jeopardize Unison's future payment, Unison requires the homeowner to pay for all taxes, insurance, maintenance, and repairs on the home. Otherwise, Unison can foreclose on the home – and get repayment of its advance at a minimum – or make "protective advances," which themselves accrue fees and

interest and are added to the principal that the homeowner will have to pay Unison, and/or liquidated damages.

64. Unison also has the right to adjust the "Ending Agreed Value" of the home, or sale price, by requiring the homeowner to pay more to Unison if Unison determines that the homeowner failed to properly maintain or repair the property.

65. The duration of Unison's contract further ensures repayment. As Unison knows, "home equity tends to increase with the years of homeownership." *2022 Unison Home Equity Report*, Unison (2022), https://perma.cc/2EWT-6Q4H/. The maximum term of the contract is thirty years, and Unison reports that the average duration in practice is ten years. *Unison Podcast*. Over the course of this "longer term holding period[]," Unison itself states, "real estate tends to perform fairly consistently." *Id.*

66. And while Unison tells homeowners that it will share in their loss if their home price drops, Unison's contract gives it a powerful means to prevent a homeowner from selling when prices are low. If Unison determines that the sale price is too low, Unison has discretion to take steps that will significantly delay the sale, which could effectively prevent it from going through. Unison disclaims liability to the homeowner related to its delay of the sale.

67. Unison is also protected by the fact that, as a practical matter, homeowners will have the least incentive to sell their homes during a drop in housing prices.

68. Unison further restricts homeowners from accessing the equity in their property by setting forth a "maximum authorized debt" and forbidding the homeowner from obtaining additional loans over that amount secured by the property, or other loans that "materially impair Investor's Rights" such as "reverse mortgage loans, shared appreciation mortgage loans, mortgage loans with negative amortization or prepayment penalties," and others.

69. If there were any doubts that Unison expects its HomeOwner Agreement product to produce consistent, ample returns, its representations to investors dispel them.

70. While Unison tells homeowners and courts that it is at risk of losing money from its products, it tells venture capital funds and other private investors the opposite. To its own investors, Unison emphasizes its high returns and the low risk of its products.

71. Unison touts its "unlimited upside and limited downside" as well as "low volatility and high risk-adjusted net returns compared to other major asset classes," including traditional home secured loans. *About Us*, Unison Investment Management, https://www.unisonim.com/about-us.

72. In the company's own words: "Residential Real Estate Generates Strong Returns!" Unison Investment Management, https://perma.cc/X53U-FMZR.

73. Unison's business model has allowed the company to expand rapidly. Unison touts that it has contracts with more than 10,000 homeowners on homes worth approximately $8.8 billion. *Id.*

74. In sum, Unison has structured its product to be lopsided in its favor from top to bottom to ensure that the homeowner will lose and Unison will gain—and that it will receive not just a future payment from a homeowner, but repayment of its initial advance plus substantial interest.

**B. Unison systematically misrepresents its mortgage loan to homeowners.**

75. Unison misrepresents how the product works and Unison's relationship to the homeowner.

76. Unison's contract misleadingly describes itself as paying the homeowner a large "Balance Payment," usually several hundred thousand dollars. However, as explained, Unison

only gives the homeowner a smaller fraction of that amount up front. The majority of the "Balance Payment" to the homeowner is illusory, as it is paid out of the equity that the homeowner already had before Unison's involvement.

77. Unison consistently markets itself as being in a partnership with homeowners. According to its website, "Unison is your partner, here when you need us." *Equity Sharing Agreement*, Unison, https://www.unison.com/equity-sharing-agreement. Its advertisements similarly state: "This is a partnership, fair and square." *How it Works - Unison Equity Sharing – Homeowner*, YouTube, https://youtu.be/KG7ygY6_sWM?feature=shared&t=42.

78. But buried in dozens of pages of contracts, Unison's contract says the opposite: "[Unison] shall not be deemed a partner . . . with, or of, Owner."

79. Nor does Unison act like a partner. An essential element of partnership is the sharing of losses or expenses. *See, e.g.*, 68 C.J.S. Partnership § 131. Unison, however, has structured this transaction so the homeowner bears all the expenses, and Unison will rarely, if ever, share any losses.

80. Unison advertises its product as an "equity sharing agreement." Unison tells homeowners that using its product is a "smarter, better way to . . . own homes" and "helps unlock your home's equity" with "[n]o extra debt, no interest, no monthly payments." How to Access Home Equity Without Debt, Unison, https://www.unison.com/blog/homeownership/how-to-access-home-equity-without-debt (last visited Aug. 29, 2025); Mail Offer, Unison, https://www.unison.com/mail-offer (last visited Aug. 29, 2025).

81. Unison's claim that homeowners do not take on debt is false. Debt is a future payment obligation, which Unison's contract requires. *See, e.g.*, Debt, *Merriam-Webster*

*Dictionary*, https://www.merriam-webster.com/dictionary/debt ("something owed" or "obligation to pay or repay someone or something in return for something received").

82. Unison's claim that there is no interest is also false. Interest is merely the amount of money owed by a borrower to a lender for the advance of money—that is, the cost of the loan. *See, e.g.*, Interest, *Black's Law Dictionary* (12th ed. 2024) ("The compensation fixed by agreement or allowed by law for the use or detention of money, or for the loss of money by one who is entitled to its use; esp., the amount owed to a lender in return for the use of borrowed money."). The future payment homeowners make to Unison includes money that homeowners owe in exchange for the advance payment.

83. Unison's representations that the product is not a loan are material and designed to hide what its financial product is, which is extremely expensive credit.

84. Unison also pitches to homeowners that the company will share in the homeowner's ups and downs.

85. In written materials provided to homeowners and on its website, Unison gives homeowners the impression that there is an equal chance of their home value increasing and decreasing over the term of the loan, such that Unison shares in the risk of loss or gain.

86. For example, Unison's contract states that the payment it will receive "could turn out to be greater than, equal to, or less than what Unison is paying you today, or even zero.

87. In its "offer" marketing materials, Unison also provides "Examples of the Payment to Unison" that share two scenarios of the home value increasing, two scenarios with the home value decreasing, and one scenario of the home value staying unchanged. These materials also provide "estimated annualized percentage costs" for several hypothetical scenarios

using figures that do not align with the actual loan amounts, and do not include fees in the calculations (as a typical APR calculation would).

88. These purported disclosures obscure rather than clarify the cost of the loan.

89. In contrast to these representations to homeowners, Unison promises its own investors that it has ensured, including through its modeling and home value forecasts, and manipulation of appraisal values, that the homes on which it has mortgages are nearly guaranteed to increase in value over the course of the contract, such that the result of the contract is that Unison will gain money and the homeowner will lose money. Indeed, Unison touts to its institutional investors its portfolio's extraordinary 20.7% annualized net return.

90. These misleading, deceptive, and confusing assertions are compounded by the lengthy and opaque nature of Unison's documents. The "contract" consists of several different documents referred to by Unison as the "Unison HomeOwner Agreement Closing Documents." These include: the Unison HomeOwner Option Agreement, Unison HomeOwner Covenant Agreement, Memorandum of Unison HomeOwner Agreement, Unison Mortgage and Security Agreement, Assignment of Unison HomeOwner Agreement, and Unison Non-Owner Occupant Notice.

91. The closing packages contain several other documents as well. In Mr. Coffin's case, the entire package totals more than 100 pages. For Ms. Whitbeck, it reached 113 pages.

92. And the contract documents contain terms that are insufficiently defined or defined only in some other document, are thick with legalese and fine print, and are confusing even for lawyers—let alone regular homeowners.

**C. Even though its product is a mortgage loan, Unison claims that it does not need to comply with any laws protecting homeowners.**

93. Even though Unison's product is a residential mortgage loan, the company claims that it is entirely exempt from all lending laws because its product is an "option" and not a loan. *See, e.g.*, *License*, Unison, unison.com/licenses (last visited March 13, 2026) ("Equity sharing agreements issued by Unison Agreement Corp. are not offered under mortgage lending licenses. Where offered, equity sharing agreements are not currently required to be licensed."); Unison, unison.com/equity-sharing-agreement (last visited March 13, 2026) (referring to the product as a "loan-alternative").

94. Unison's representations are false.

95. No matter how Unison labels its product, it is a mortgage loan. Unison provides homeowners with an advance of money, secures that advance through a mortgage on their home, and then requires payment within 30 years or less. That is a mortgage loan, but with worse terms for borrowers than an ordinary mortgage loan.

96. While Unison claims that its product is not a loan because it could lose money if the housing market falls, that does not distinguish its product from more traditional mortgage loans or reverse mortgages. During the 2008 crash, for example, many mortgages defaulted, mortgage lenders and associated companies faced huge losses, and government bailouts were necessary.

97. Every lender faces a risk they won't be paid back. That is especially true with non-recourse loans, where the lender can only recover as much as the value of the collateral securing the loan.

98. After the loan is originated and the lien is placed on the property, Unison immediately bundles it with other loans and places it into an asset-backed security. That's

exactly how other mortgage lenders securitize home-secured loans to reduce risk to the lender. Investors analyze Unison's loan pools using the same analytics that they use for other mortgage-backed securities.

99. Unison's CEO himself has described this kind of product as "similar to any home financing transaction." Jim Wood, *Equity Access*, Marin Magazine (Apr. 10, 2007), https://marinmagazine.com/community/local-business/equity-access/.

100. Despite Unison's efforts to conceal the nature of its product, various documents involved in the process state expressly that the product is a loan.

101. Documents from the loan closing produced by the title company engaged by Unison repeatedly refer to the homeowner as the "borrower."

102. These documents also refer to Unison as the lender.

103. These documents refer to Unison's Initial Payment as a "loan."

104. As a part of the loan closing, homeowners also pay a mortgage recording tax. The amount of this tax is calculated as a share of the principal debt—in this case, the Initial Payment—that the mortgage secures.

105. The "offer" marketing documents show that the homeowner will be required to pay the loan at or before the end of the thirty year term, including setting forth: "If you have not sold your Property or otherwise terminated the Unison HomeOwner Agreement by the end of the thirty (30) year Term, you will need to sell the Property or otherwise settle the Unison HomeOwner Agreement by paying Unison an amount equal to the value of its investment interest in the Property at that time." This language is not conditional on a purported exercise of an option.

106. Because Unison claims its product is not a mortgage loan, it fails to comply with numerous New York laws protecting homeowners.

**D. Mr. Coffin is ensnared in a predatory Unison mortgage.**

107. Mr. Coffin is 70 years old and has owned his home in Brooklyn, New York since 2012.

108. Mr. Coffin worked as a firefighter for over 25 years.

109. When he entered the Unison contract in 2021, Mr. Coffin was retired and living alone.

110. At that time, Mr. Coffin, as a retiree, was facing a diminished income to cover his basic expenses.

111. In 2021, Mr. Coffin learned about Unison from a cable television advertisement.

112. After seeing Unison's marketing materials, including the website at www.unison.com, Mr. Coffin had a telephone conversation with a Unison representative.

113. Mr. Coffin believed he could use the money he received from Unison to help pay off his existing home equity line of credit, giving him greater financial flexibility to cover ongoing household and personal expenses.

114. Based on what he saw in Unison's materials and his conversation with Unison, Mr. Coffin understood the arrangement with Unison to be a loan.

115. On or about August 17, 2021, Mr. Coffin signed Unison's thick stack of form documents.

116. As part of its origination process, Unison ordered an appraisal on Mr. Coffin's home.

117. Unison chose the appraiser.

118. On information and belief, Unison deflated the appraised value of Mr. Coffin's home.

119. Unison further reduced the low appraisal value by 2.5% to arrive at the "Original Agreed Value" for Mr. Coffin's home.

120. Unison offered Mr. Coffin an advance payment called an "Initial Payment" of $177,625, equal to 17.9% of the "Original Agreed Value." But Unison actually paid Mr. Coffin much less, $167,490.45.

121. The difference—over $10,000—consisted of loan and closing fees that were added to Mr. Coffin's debt to Unison. These included a $5,328.75 "transaction fee" and $510 appraisal fee, both payable to Unison. They also included $4,296.80 in real estate taxes and recording fees. *Id.*

122. The state mortgage tax was calculated based on the value of Unison's advance payment to Mr. Coffin.

**E. Mr. Coffin terminates Unison's hidden mortgage loan.**

123. In early 2025, Mr. Coffin was considering selling his home. He therefore sought to be released from his agreement from Unison.

124. Unison also imposes a restriction period of three years in which the homeowner cannot buy Unison out of the agreement, forcing Mr. Coffin to wait three years before terminating his agreement with Unison.

125. In February 2025, Unison provided information about his cost to pay off the loan.

126. Unison told Mr. Coffin that he would have to pay Unison approximately $412,387 to buy his way out of the contract. This was the first time Mr. Coffin learned that he would owe so much money.

127. In other words, after about three and a half years, Unison required Mr. Coffin to repay Unison the $167,490.45 advance, and $10,135.55 in closing costs, plus $234,375 to terminate the contract.

128. That works out to an annual simple interest rate of around 40.81% and an Annual Percentage Rate of 28.6%.

129. That is far higher than the applicable maximum rate permitted under New York law.

130. It is also far higher than the interest rate for other mortgage or home equity loans.

131. Mr. Coffin had no idea that the loan would obligate him to repay so much more than Unison originally loaned him.

132. Had Mr. Coffin understood the true cost of his transaction with Unison at the time he entered into the contract, he would not have agreed to it.

133. On March 18, 2025, Mr. Coffin took out a refinance loan in the amount of $425,800 to satisfy Unison's pay-off demand. He used the proceeds of the refinance loan to pay Unison.

134. Mr. Coffin paid Unison a total of $412,387 on March 18, 2025.

135. Unison confirmed its loan was paid in full on March 24, 2025.

**F. Ms. Whitbeck is locked into a predatory Unison mortgage.**

136. Ms. Whitbeck has owned her home in West Babylon, New York since 2000.

137. She lives there with her boyfriend, her adult son, and her mother, for whom she is the primary caregiver.

138. Ms. Whitbeck was a United States Postal Service worker for 36 years.

139. When she entered the Unison contract in 2018, Ms. Whitbeck was exploring her options to repay some credit card debt and to renovate her kitchen.

140. At about that time, Unison called Ms. Whitbeck to tell her about its HomeOwner Agreement product.

141. Unison told Ms. Whitbeck that it could help her access her home equity without taking on any debt and without interest.

142. On or about November 1, 2018, Ms. Whitbeck signed Unison's thick stack of form documents.

143. As part of its origination process, Unison ordered an appraisal on Ms. Whitbeck's home.

144. Unison chose the appraiser.

145. When Ms. Whitbeck contested the appraiser's estimate, Unison refused to permit her to obtain her own appraisal.

146. Instead, Unison chose a second appraiser who provided an even lower estimate. Unison used the average of these two values to arrive at the appraised value for Ms. Whitbeck's home.

147. On information and belief, Unison deflated the Original Agreed Value of Ms. Whitbeck's home.

148. Unison offered Ms. Whitbeck an advance payment[4] of $50,000, equal to 11.5% of that "Original Agreed Value." But Unison actually paid Ms. Whitbeck much less, $43,960.50.

[4] At the time, Unison referred to this as the "Unison Investment Payment."

149. The difference—over $6,000—consisted of loan and closing fees that were added to Ms. Whitbeck's debt to Unison. These included a $1,950.00 "transaction fee," payable to Unison. They also included $4,296.80 in real estate taxes and recording fees.

150. The state mortgage tax was calculated based on the value of Unison's advance payment to Ms. Whitbeck.

151. Since entering the Unison HomeOwner Agreement, Ms. Whitbeck has made various improvements to her home. She has kept careful records of these costs so that she may claim a Remodeling Adjustment to reduce her repayment obligation to Unison when her agreement ends.

152. In approximately 2023, Ms. Whitbeck began thinking about the legacy that she would leave to her son. Ms. Whitbeck's home is her only significant asset.

153. Based on Unison's estimates, Ms. Whitbeck would have to repay Unison between $156,050 and $224,063 to buy her way out of the contract today.

154. In other words, after a little over 7 years, Unison claims it has the right to make Ms. Whitbeck repay her $50,000 advance with an additional $106,050 to $174,063. That is equivalent to an annual simple interest rate of between 28.6% and 47.0% and an annualized percentage rate ranging from 16.6% to 22.5%. On top of this, in the event that Ms. Whitbeck were to exit her agreement, she would also have to pay an undisclosed amount in closing costs – easily thousands of dollars more – to remove Unison's lien on her home.

155. Until that happens, Unison's lien will continue to encumber Ms. Whitbeck's property, preventing her from accessing the equity in her home and restricting her rights to use her property.

156. Ms. Whitbeck had no idea that the loan would obligate her to pay so much more than Unison originally loaned her.

157. Ms. Whitbeck cannot afford to repay those amounts to Unison.

158. When the agreement ends, most likely upon Ms. Whitbeck's death, Unison will have the contractual right, and economic incentive, to force a sale to recoup its advance and exorbitant interest. As a result, Ms. Whitbeck will be unable to pass her home – her only significant asset – to her son.

159. What's more, after Unison takes its share of the sale proceeds, little equity will remain for her son.

**G. Plaintiffs' transactions with Unison were structurally identical**

160. Plaintiffs never met in person with anyone from Unison.

161. At no point did Unison or its agents explain the true cost or impact of the transaction to Plaintiffs.

162. Unison told Plaintiffs that they would not need an attorney for the closing.

163. Unison required Plaintiffs each to sign at least eight separate documents comprising their contractual agreements with Unison. These included the Unison HomeOwner Option Agreement, Unison HomeOwner Covenant Agreement, Memorandum of Unison HomeOwner Agreement, Unison Mortgage and Security Agreement, Assignment of Unison HomeOwner Agreement, and Unison Non-Owner Occupant Notice.

164. As part of these contracts, Plaintiffs granted Unison mortgages on their homes, which secured their obligations under the contracts on penalty of foreclosure.

165. Unison drafted all the documents Plaintiffs signed.

166. Unison presented the documents to Plaintiffs on a take-it-or-leave-it basis.

167. Plaintiffs lacked college degrees and had limited experience in complex financial transactions.

168. Unison is a multi-million-dollar financial technology company.

169. Unison's complex methods of market and financial analysis give it far superior knowledge of how the contracts will work in practice.

170. Unison did not provide required lending disclosures to Plaintiffs.

171. Instead, Unison provided "disclosures" that did not comply with lending laws and were designed to be confusing and misleading.

172. As a result, Unison obscured the finance charges and cost of the credit.

173. Plaintiffs did not, and could not, understand the true nature of the agreements and their future payment obligations to Unison.

174. Unison's agreements with Plaintiffs were structured so that Unison paid Plaintiffs each an initial advance, received security through a mortgage on their respective homes, and required future payment.

175. Unison's agreements with Plaintiffs ensured that their future payments to the company would almost certainly far exceed the advances they received.

176. Had Plaintiffs understood the true costs of their transactions with Unison at the time they entered into the contracts, they would not have agreed to them.

## CLASS ACTION ALLEGATIONS

177. Plaintiffs bring this class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure.

178. Plaintiffs seek certification of the following class:

> All persons who entered into a Unison HomeOwner Agreement or similar product with Unison relating to a property located in the State of New York.

179. The class is so numerous that joinder of all members is impractical. While the exact number and identity of class members is unknown to Plaintiffs at this time and can only be determined through appropriate discovery, public records show that Unison has liens on at least hundreds of New Yorkers' homes. Unison's own records will provide both the precise number and identities of the class members.

180. There are questions of law and fact common to all members of the class. Those common questions include, but are not limited to, the following:

a. Are Unison's contracts and practices deceptive under N.Y. G.B.L. § 349?

b. Are Unison's marketing tactics deceptive under N.Y. G.B.L. § 350?

c. Are Unison's contracts usurious under N.Y. Gen. Oblig. L. § 5-501?

d. Did Unison make high-cost home loans with terms prohibited under N.Y. Banking L. § 6-l?

e. Did Unison make home loans without the license required under N.Y. Banking Law § 590?

181. Plaintiffs claims are typical of the class claims because they, like the class members, entered into HomeOwner Agreements with Unison. Plaintiffs contracts with Unison are typical, as at all relevant times, Unison's contracts with all class members have contained materially similar terms with respect to the structure of its advance payments; purported "option" mechanisms for ensuring its future payment; securing the homeowners' obligations through a security interest in a residence; and deceptive characterizations of the product.

182. Plaintiffs will fairly and adequately protect the interests of the class because they share the same interest in challenging Unison's practices as the rest of the class, their interests do not conflict with the interests of the class, and they have retained counsel experienced in litigating class actions and matters involving similar questions of law.

183. The questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating class members' claims. There will be no difficulty in the management of this action as a class action because Unison retains detailed data about the class members.

**FIRST CLAIM FOR RELIEF**
**USURY**
**N.Y. General Obligations Law § 5-501**

184. Plaintiffs incorporate by reference each allegation set forth above as if set forth at length herein.

185. N.Y. Gen. Oblig. Law § 5-501 prohibits the charging of interest on a loan above 16%.

186. Unison's product is a loan.

187. The effective Annual Percentage Rate on Unison's product far exceeds 16%.

188. At the time Mr. Coffin satisfied Unison's payoff demand, Mr. Coffin's contract entailed the payment of interest at an effective simple interest rate of 40.81%.

189. Unison is consciously and voluntarily requiring and taking more than the legal rate of interest. Because Unison structures its contracts to require return rates that will far exceed 16%, Unison willfully intended to enter into usurious transactions.

190. As such, Unison has violated N.Y. Gen. Oblig. Law § 5-501.

191. Plaintiffs and the class are entitled to relief, including voiding of the loans and Unison's forfeiture of all interest on its contract and penalties. *See* N.Y. Gen. Oblig. Law § 5-511.

**SECOND CLAIM FOR RELIEF**
**UNLICENSED MORTGAGE LENDING**
**N.Y. Banking L. § 590**

192. Plaintiffs incorporate by reference each allegation set forth above as if set forth at length herein.

193. Unison has made and continues to make mortgage loans without a license, in violation of N.Y. Banking L. § 590.

194. In New York state, no person, business or other entity "shall engage in the business of making mortgage loans without first obtaining a license from the superintendent" of financial services unless they are an exempt organization or they make fewer than three loans per year in the state. N.Y. Banking L. § 590(2)(a).

195. A "mortgage loan" is any "loan to a natural person made primarily for personal, family or household use, secured by either a mortgage or deed of trust on residential real property." N.Y. Banking L. § 590(2)(a).

196. A person or entity "makes a mortgage loan" when they, "for compensation or gain, either directly or indirectly, advance[e] funds, offer[] to advance funds, or mak[e] a commitment to advance funds to an applicant for a mortgage loan or a mortgagor as a mortgage loan." N.Y. Banking L. § 590(1)(c)

197. Unison's HomeOwner Agreement is a mortgage loan.

198. In return for Unison's advance of funds, Plaintiffs were each required to pay Unison at a future time.

199. Those obligations were secured by mortgages on Plaintiffs' residences.

200. Plaintiffs took out the loans primarily for personal, family, or household purposes.

201. Unison directly advanced the funds to Plaintiffs for its own gain.

202. Unison is not an exempt organization. N.Y. Banking L. § 590(1)(e).

203. Unison makes more than three mortgage loans per year. N.Y. Banking L. § 590(2)(a)(iii).

204. Accordingly, Unison is required to be licensed under N.Y. Banking L. § 590(2)(a).

205. Unison does not have a New York mortgage lending license.

206. Because Unison made mortgage loans to Plaintiffs and the class without a license, the class is entitled to relief against Unison, including recovery of civil penalties and such other relief as is equitable and just. N.Y. Banking L. § 598.

**THIRD CLAIM FOR RELIEF**
**PROHIBITED TERMS AND PRACTICES IN HIGH-COST HOME LOANS**
**N.Y. Banking L. § 6-l**

207. Plaintiffs incorporate by reference each allegation set forth above as if set forth at length herein.

208. Unison's HomeOwner Agreement is a high-cost home loan under N.Y. Banking L. § 6-l.

209. A "home loan" under N.Y. Banking L. § 6-l is a loan, including an open end credit plan, made on property in New York state, to a natural person, for personal, family or household purposes, secured by a mortgage or deed of trust on real estate that is or will be the borrower's principal dwelling. The definition excludes reverse mortgage transactions, loans guaranteed by the state mortgage agency, and loans with principal amounts that, at the time of

origination, exceed the federal national mortgage association's conforming loan size limit for comparable dwellings.

210. In New York, a reverse mortgage loan must be secured by a first mortgage. NY Real Property L. § 280, 280-a, and 280-b.

211. Unison's HomeOwner Agreements with Plaintiffs created home loans under N.Y. Banking L. § 6-l.

212. In return for Unison's advance of funds, Plaintiffs were required to pay Unison at a future time.

213. That obligation was secured by a mortgage on Plaintiffs' homes and principal dwellings, which are located in New York.

214. Plaintiffs used the advances primarily for personal, family, or household purposes.

215. Unison's HomeOwner Agreements with Plaintiffs are not reverse mortgage loans because they are secured by second mortgages on their homes.

216. Unison's Initial Payments to Plaintiffs did not exceed the federal national mortgage association's conforming loan size limit for comparable dwellings.

217. A second lien home loan is "high-cost" if it charges an annual percentage rate of interest more than "nine percentage points over the yield on treasury securities having comparable periods of maturity on the fifteenth day of the month immediately preceding the month in which the application for extension of credit is received by the lender." N.Y. Banking Law § 6-l(1)(g)(i). If a home loan charges an "initial or introductory rate" below the statutory threshold, an excessive rate charged after that initial period will trigger coverage.

218. Mr. Coffin submitted his application for a Unison HomeOwner Agreement in July 2021. That Agreement was subject to a 30-year term.

219. On the fifteenth of June 2021, the yield on 30-year Treasury securities was 2.20%. *Market Yield on U.S. Treasury Securities at 30-Year Constant Maturity*, https://fred.stlouisfed.org/series/DGS30 (last visited March 17, 2026). Accordingly, Unison's HomeOwner Agreement with Mr. Coffin was high-cost if it charged an annual percentage rate of interest more than 11.20%. *Market Yield on U.S. Treasury Securities at 30-Year Constant Maturity*, https://fred.stlouisfed.org/series/DGS30 (last visited March 17, 2026).

220. Unison's HomeOwner Agreements with Plaintiffs include an initial or introductory period in which Unison does not charge interest.

221. For Mr. Coffin, this period ended when he notified Unison of his intent to exit the Agreement.

222. Mr. Coffin subsequently repaid $412,387 to Unison for an annual percentage interest rate of 28.6%.

223. N.Y. Banking Law § 6-l prohibits lenders who make high-cost home loans from engaging in a long list of practices in connection with those loans.

224. Unison is a lender because it is engaged in the business of making mortgage loans and is, therefore, required to obtain a license. N.Y. Banking Law § 6-l; N.Y. Banking Law § 590(1)(c), (f), (2).

225. Unison did not provide Plaintiffs with a Homeownership Counseling Notice in violation of N.Y. Banking L. § 6-l(2)(l)(i).

226. Unison did not include a legend on its HomeOwner Agreements with Plaintiffs stating that they were high-cost home loans as required by N.Y. Banking Law § 6-l(2-a)(a).

227. Unison charged Mr. Coffin a balloon payment of $412,387. This payment was more than twice as large as the average of Mr. Coffin's earlier payments (because there were no earlier payments) and became due and payable less than fifteen years after the loan's origination. Accordingly, Unison violated N.Y. Banking Law § 6-l (2)(b).

228. Unison directly financed covered points and fees that were more than 3% of the principal amount of its loan to Plaintiffs.

229. Unison charged Mr. Coffin transaction and appraisal fees totaling $5838.75 at closing. Rather than require payment at that time, Unison added these fees to Mr. Coffin's principal balance. Mr. Coffin repaid these fees with 28.6% interest when he exited his Unison HomeOwner Agreement.

230. Under N.Y banking L. § 6-1(7), all of the interest, fees, and closing costs charged on the loan shall be forfeited and any amounts paid shall be refunded. Plaintiffs and the class are entitled to either a refund of all amounts paid in interest, fees, and closing costs, or a declaration that such amounts are forfeit and that Unison cannot collect them.

231. Mr. Coffin and the class are entitled to reasonable attorneys' fees under N.Y. Banking L. § 6-1(8).

232. Mr. Coffin and the class are entitled to such injunctive, declaratory, and equitable relief, including equitable reformation of the Unison contracts, as the court may deem proper. N.Y. Banking L. § 6-1(9).

233. Each of Unison's violations of N.Y. Banking L. § 6-l was intentional. The loans are therefore void under N.Y. Banking L. § 6-l (10).

**FOURTH CLAIM FOR RELIEF**
**DECEPTIVE BUSINESS PRACTICES/OMISSIONS**
**N.Y. General Business Law § 349**

234. Plaintiffs incorporate by reference each allegation set forth above as if set forth at length herein.

235. GBL § 349 declares that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in" New York are unlawful. N.Y. Gen. Bus. § 349(a).

236. GBL § 349(h) provides a private right of action to any person injured by reason of violation of that Section.

237. Unison's contract documents contain several statements that are likely to deceive members of the public.

238. The contracts Unison provided to Plaintiffs and the class repeatedly state that Unison will pay the homeowner an initial investment payment and an additional "Balance Payment" to exercise its option that is typically hundreds of thousands of dollars (in Mr. Coffin's case, $515,113, and in Ms. Whitbeck's, $150,013).

239. This is likely to deceive reasonable consumers into believing that they would be receiving this sum of money from Unison.

240. However, as explained above, most of that amount is "paid" to the homeowner as an offset against the amount Unison takes from the proceeds of the sale of the home.

241. This deceptive statement is material, since a reasonable consumer would attach significant importance to whether they would receive hundreds of thousands of dollars in payments from entering into the contract with Unison.

242. Unison's contract also omits the true cost of its loan. This is a material omission, since the amount a homeowner will have to pay Unison will be very important to their decision of whether to enter into this contract.

243. This omission is particularly misleading in light of Unison's other statements that give the impression that Unison is as likely to lose money as to make money.

244. Based on its superior access to information, experienced analysts, sophisticated models, access to data on its past performance, Unison knows that it has structured its product to ensure that it is far more likely that Unison will receive a large sum of money from the homeowner, as Unison has repeatedly stated to its investors.

245. This misleading statement is material, since a reasonable consumer would attach significant importance to whether Unison is actually sharing in any risk, or has effectively ensured its future payout.

246. Like other reasonable consumers, Plaintiffs would not have entered into these contracts with Unison if Unison had accurately disclosed the true cost of the transaction and not engaged in deception regarding the risks and costs of the transaction.

247. Unison's contracts omit the fact that Unison is not licensed to engage in lending, including mortgage lending.

248. A reasonable consumer is likely to be deceived by this omission, since they would not suspect that Unison's products are illegal, unlicensed loans.

249. This omission is also material, since a reasonable consumer would attach importance to the fact that the company placing a mortgage on their home and lending them money is doing so without a license.

250. Upon information and belief, Unison's representations regarding the fees assessed for the origination of the contract are false or misleading, in that Unison profits from certain fees while indicating that they are bona fide fees reflecting the costs of the transaction.

251. These violations have caused and continue to cause harm to Plaintiffs and the class, including in the form of unlawful encumbrances on their homes, fees incurred as part of an unlawful transaction, and unlawful payments of principal and interest to Unison.

252. Unison's actions are consumer oriented and have had a broad impact on New York consumers at large.

253. Unison committed the above-described acts willfully or knowingly.

254. Unison's wrongful and deceptive acts have caused injury and damages to Plaintiffs and the class and, unless enjoined, will cause further injury.

255. As a direct and proximate result of Unison's violations, Plaintiffs and the class have suffered and continue to suffer compensable harm and are entitled to recover actual and treble damages, costs, and attorneys' fees.

256. Plaintiffs also seek an injunction prohibiting Unison from enforcing the terms of the Unison HomeOwner Agreements against all persons who own residential property in New York because Unison obtained the purported agreements by deceptive means, and seeks equitable reformation of such agreements.

## FIFTH CLAIM FOR RELIEF
## FALSE ADVERTISING
## N.Y. General Business Law § 350

257. Plaintiffs incorporate by reference each allegation set forth above as if set forth at length herein.

258. NY GBL § 350 states, "False advertising in the conduct of any business, trade or commerce or in the furnishing of any services in this State is hereby declared unlawful."

259. GBL § 350-e provides a private right of action to any person injured by reason of violation of that Section.

260. Unison markets itself as being in a partnership with homeowners.

261. Unison says its product is not a loan.

262. To entice homeowners to use Unison, the company markets itself as a "simple" "loan alternative" option that creates "no debt" and has "no interest" or monthly payments.

263. It also tells homeowners that Unison is their "partner" in the transaction "fair and square" and Unison will share in any ups or downs of the home's future value.

264. None of these statements are true.

265. Unison's consumer-facing representations were likely to mislead a reasonable consumer acting reasonably under the circumstances.

266. Unison committed the above-described acts willfully or knowingly.

267. As a direct and proximate result of Unison's violations, Plaintiffs and the class have suffered and continue to suffer compensable harm and are entitled to recover actual and treble damages, costs, and attorneys' fees.

268. Plaintiffs and the class seek equitable relief, including equitable reformation of the Unison agreements, restitution, and such other relief as is equitable and just.

269. Plaintiffs seek a declaration that Unison's advertisements of the agreement are deceptive, and an order prohibiting Unison from advertising the Unison HomeOwner Agreements to New Yorkers in a deceptive manner. This relief applies to all persons who own or may in the future own residential property in New York.

270. Plaintiffs also seek an injunction prohibiting Unison from enforcing the terms of the Unison HomeOwner Agreements against all persons who own residential property in New York because Unison obtained the purported agreements using deceptive advertising tactics.

**SIXTH CLAIM FOR RELIEF**
**IMPROPER INFLUENCE OVER APPRAISALS**
**N.Y. Banking L. § 590-b**

271. Plaintiffs incorporate by reference each allegation set forth above as if set forth at length herein.

272. In New York, a lender may not "improperly influence or attempt to improperly influence the development, reporting, result or review of a real estate appraisal relating to real property securing a home loan." N.Y. Banking L. § 590-b(2).

273. Before entering into its Unison HomeOwner Agreements with Plaintiffs, Unison conducted a real estate appraisal on Plaintiffs' homes, the properties that would secure its advances to them.

274. On information and belief, Unison improperly influenced the development, reporting, and result of the appraisal on Plaintiffs' homes to reduce the appraised value and increase its returns under its agreement.

275. Plaintiffs and the class are entitled to relief against Unison, including recovery of actual damages and such injunctive, declaratory, and other equitable relief as the court deems appropriate. N.Y. Banking L. § 590-b(4), (5).

**SEVENTH CLAIM FOR RELIEF**
**DECLARATORY RELIEF - FEE-SHIFTING PROVISION UNENFORCEABLE**

276. Plaintiffs incorporate by reference each allegation set forth above as if set forth at length herein.

277. Federal courts "may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201.

278. Unison's HomeOwner Agreement provides that, "[i]f a dispute arises out of the Unison HomeOwner Agreement, then the prevailing party will be entitled to reasonable attorneys' fees and costs."

279. Unison's fee-shifting provision is procedurally and substantively unconscionable for the following reasons:

a. Unison is a large financial company engaged in the business of soliciting homeowners and placing them in agreements like the one entered by Plaintiffs;

b. Unison, on one hand, and Plaintiffs, and other similarly situated consumers, on the other, occupy significantly unequal bargaining positions;

c. Unison drafted all documents, including the fee-shifting provision, amounting to over 50 pages in the contract package;

d. Unison presented the fee-shifting provision as part of a contract of adhesion;

e. Unison drafted the documents to obscure the true nature and cost of the transaction, preventing Plaintiffs, and other similarly situated consumers, from exercising a meaningful choice to assume the risks of the fee-shifting provision;

f. The fee-shifting provision is substantially one-sided in favor Unison because, absent the provision, Plaintiffs, and other similarly situated

consumers, would have the right to recover attorneys' fees under a variety of statutes, while Unison would have no such right;

g. The fee-shifting provision exposes Plaintiffs, and other similarly situated consumers, to the risk of incurring tens or hundreds of thousands of dollars in liability for Unison's attorneys' fees;

h. Unison includes this provision although it knows that the consumers it targets lack sufficient income to meet their expenses and would be unable to pay those fees;

i. In practice, the fee shifting provision deters borrowers with Unison HomeOwner Agreements from bringing legitimate claims and accessing those legal remedies to which they are entitled under the law, because doing so would expose them to a significant risk of financial ruin;

j. The fee-shifting provision poses no like risk to Unison, a corporation with access to substantial resources.

280. Unison's fee-shifting provision is also contrary to public policy.

281. New York lawmakers enacted N.Y. Gen. Bus. § 349 to "ensure the most meaningful and effective protection to New Yorkers against unfair, deceptive, and abusive business practices." N.Y. Gen. Bus. § 348.

282. N.Y. Gen. Bus. § 349 and § 350's fee-shifting provisions – which allow courts to award attorneys' fees to plaintiffs, but not defendants – furthers this purpose by encouraging private enforcement.

283. The provisions also embody a strong public policy that no one should be denied the statute's protections because of their inability to afford an attorney.

284. Unison's contractual fee-shifting provision cannot be reconciled with this important public policy.

285. Unison entered this agreement from a superior bargaining position.

286. Unison used that bargaining position to unilaterally dictate the terms of its HomeOwner Agreement with Plaintiffs, including the fee-shifting provision.

287. Under that provision, consumers who challenge Unison's practices risk liability for tens, and more likely hundreds, of thousands of dollars in attorneys' fees. That liability would spell financial ruin.

288. While N.Y. Gen. Bus. § 349 and § 350 seek to encourage consumer enforcement, Unison's fee-shifting provision discourages it.

289. Accordingly, Unison's fee-shifting provision is contrary to public policy and unenforceable.

290. Because Plaintiffs are filing this Complaint, there is an existing dispute about whether Plaintiffs will be liable to pay Unison's attorneys' fees in this action.

291. The parties have genuinely opposing and substantial interests in this dispute, as attorneys' fees for litigation can cost tens of thousands, if not hundreds of thousands, of dollars.

292. A judicial determination of whether Unison will be permitted to seek to recover their attorneys' fees if they prevail will provide the parties with certainty and finality regarding their rights and the risks of continuing litigation.

**JURY DEMAND**

293. Plaintiffs hereby demand trial by jury as to all issues so triable in the above matter.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against the defendants as follows:

A. An order certifying the proposed class and appointing Plaintiffs as class representatives and their counsel as class counsel, as soon as practicable;

B. An order declaring the Defendants jointly and severally liable;

C. Declaratory relief determining that the fee-shifting provision in the HomeOwner Agreement is unenforceable in this action;

D. Declaratory relief determining that Unison's HomeOwner Agreements are unlawful;

E. Refund of any interest fees or costs, collected and retained in connection with Unison's HomeOwner Agreements, and forfeiture of any right Unison may have to collect those amounts in the future under N.Y. Banking L. § 6-l(7);

F. An order providing for any and all additional injunctive, equitable, or declaratory relief the Court deems appropriate, including equitable reformation of Unison's form agreements;

G. An order awarding monetary damages, including but not limited to any compensatory, incidental, or consequential damages in an amount to be determined by the Court or jury;

H. An order awarding treble damages pursuant to N.Y. Gen. Bus. § 349 and N.Y. Gen. Bus. § 350;

I. An order awarding civil penalties under N.Y. Banking L. § 598(5);

J. An order awarding interest at the maximum allowable legal rate on the foregoing sums;

K. An order awarding reasonable attorneys' fees, costs, and expenses, including under N.Y. Gen. Bus. § 349, N.Y. Gen. Bus. § 350, and N.Y. Banking L. §6-l,; and

L. Such further relief as this Court may deem just and proper.

RESPECTFULLY SUBMITTED AND DATED this 11th day of May, 2026.

NEW YORK LEGAL ASSISTANCE GROUP

By: /s/ Danielle Tarantolo
Danielle Tarantolo
Email: dtarantolo@nylag.org
Claire Torchiana
Email: ctorchiana@nylag.org
Julie Howe
Email: jhowe@nylag.org
100 Pearl Street, 19th Floor
New York, New York 10004
Telephone: (212) 613-5000
Facsimile: (212) 714-7589

TERRELL MARSHALL LAW GROUP PLLC

By: /s/ Blythe H. Chandler
Beth E. Terrell, *Pro Hac Vice Forthcoming*
Email: bterrell@terrellmarshall.com
Blythe H. Chandler, *Pro Hac Vice*
Email: bchandler@terrellmarshall.com
Eleanor Eagan, *Pro Hac Vice*
Email: eeagan@terrellmarshall.com
1700 Westlake Avenue North, Suite 300
Seattle, Washington 98109
Telephone: (206) 816-6603
Facsimile: (206) 319-5450

Daniel A. Schlanger
Email: dschlanger@consumerprotection.net
Evan S. Rothfarb
Email: erothfarb@consumerprotection.net
SCHLANGER LAW GROUP LLP
60 East 42nd Street, 46th Floor
New York, New York 10165
Telephone: (212) 500-6114
Facsimile: (646) 612-7996

*Attorneys for Plaintiffs*